## Venison v. Commonwealth.
(Decided March 11, 1938.)

ROBERT C. SIMMONS, F. M. TRACY, STEPHENS L. BLAKELY and ORIE S. WARE for appellant.

HUBERT MEREDITH, Attorney General, and A. E. FUNK, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

On September 30, 1937, the grand jury of Kenton county returned a true bill, charging appellant with the crime of rape, alleged to have been committed August 16, 1937. The defendant was arraigned on October 14, 1937, entering a plea of not guilty. Upon a showing of a lack of funds with which to employ counsel, appellant was assigned counsel and his trial set for November 4th. On this day both parties announced ready; the

court overruled demurrer to the indictment; the trial proceeded, the jury returning a verdict of guilty and fixing the penalty at death. Motion for new trial was overruled, judgment entered in accord with the verdict, and from which this appeal is prosecuted.

The chief grounds urged for reversal of the judgment are: (1) That the court committed prejudicial error in permitting a confession of appellant's to be read to the jury, because same was made under such circumstances as brought it within the condemnation and inhibition of section 1649b-1, Kentucky Statutes, commonly known as the "anti-sweating act." (2) Because the judgment entered was in a form, and to an intent and purpose not authorized by either statute or code provision.

The facts developed by the commonwealth show that on the evening of August 16, 1937, prosecutrix, a stenographer, living with her mother in Covington, in company with a young man, attended an entertainment of some sort in Cincinnati, just across the Ohio river from Covington. After leaving Cincinnati, about 11:45 p. m., and crossing the river, they concluded to drive out the Dixie Highway. After driving out this highway some distance, they decided to drive into Dudley Pike, which, if followed, would lead them back to Covington. After they had driven about a half mile on this pike, they noticed another car following, which finally overtook their car. Thinking the driver was attempting to pass, the driver of the car in which prosecutrix and her companion were riding pulled to the right, but the other car came in close, "sideswiped" their car, and blocked its way.

At this point some one (who proved to be appellant) got out of the blocking car, came directly to the other car, wielding a knife, asserting that his car had been wrecked, and demanding that the damage be settled at once. At this point appellant's companion, who it later developed was Lattimore, appeared. The prosecutrix, and particularly her companion, thought it was a holdup, and upon demand for payment for the damaged car the young man handed over all the money he had; this being passed to Lattimore. Appellant and his companion appeared to be dissatisfied with the sum, and one or the other of them struck the young man over the head with an instrument, thought to be a pistol.

At this stage appellant and Lattimore said they would take prosecutrix and her friend to the police station, and at once undertook to drag them from their car. This attempt met with decided resistance, and appellant struck the prosecutrix in the face with his fist. She and her companion thereupon got out of their car, appellant conducted them to his car, and forced them to get in, placing them on the back seat with Lattimore between them, still insisting that he intended to take them to the police station. Appellant drove to Charter Oak Road, then turned back into Dudley Pike, thence to the entrance of the Summit Hill Golf Park, where he drove in, stopped, and turned out his lights. Appellant said: "Are you ready to talk?" A discussion was had as to the subject of the "talk," and appellant said: "I think I will kill you both right now." He said to the young man, "Start praying," and the young man did mumble some words, and appellant said, "Pray louder," and struck him on the head, saying to Lattimore: "If he starts anything funny, you know what to do." Appellant then opened the back door of his car and forced prosecutrix out, holding her with one hand, displaying a knife in the other. He then forced her to go with him some 25 or 30 feet distant into the park, and among some shrubbery. He, still holding the knife, forced her to lie on the ground, compelled her to remove her underwear, and proceeded to and did beyond question, accomplish his design. Prosecutrix complained of pain and appellant replied: "I ought to hurt you, you dirty b——." After he had accomplished his purpose, he required prosecutrix to watch him while he responded to a call of nature.

Appellant then took prosecutrix back to his car, saying: "I think I will throw you in the river now." She was put in the car, and after driving a short distance, both prosecutrix and her companion were let out of the car on the Charter Oak Road. Prosecutrix and her companion then started to walk to the point where their car had been left, and on the way came to a house and concluded to telephone, but were unable to arouse any one and started on. Some vicious dogs impeded their progress, so they sat on the front porch of the home until near daylight, when some one in a passing car picked them up and took them into Covington. When they arrived there they first advised police officers as to what had occurred, then proceeded to the

office of the family physician, and thence to the home of prosecutrix.

The mother of prosecutrix testified that when the daughter arrived home the next morning, her arms were "black and blue" and she carried definite marks of finger nails on her arms; she was a "pitiful sight; her face was bruised and swollen, and her throat bore marks as from a knife. Her clothing, both suit and underclothing were badly soiled."

The companion of prosecutrix corroborated her testimony in every particular, except as to what occurred out of his sight. He testified to noises heard from the point where appellant had taken her, and says he was being held in the car by Lattimore. He (as did prosecutrix) exhibited no hesitancy in identifying appellant, which, as we observe from the record, was done just after appellant was returned to Covington. Appellant admitted at that time that he had seen witness on the night of the occurrence.

Two physicians testified, one the family physician, and the other called for consultation. The family physician says prosecutrix came to him early on the morning of the 17th, at which time he made examination and found she was then going through a naturally recurring period (which she stated was her condition at the time of the assault), and he advised her to come back later, which she did on or about the 19th of August. His examination, as he said, showed some abrasion which indicated a forcible penetration. The other physician, going more into detail, agreed fully with the family physician's conclusion.

Then follows the testimony of the police officers, which testimony brings forward the confession, the introduction of which is subjected to severe criticism. From this testimony it appears that after the 17th of August appellant became and was until October 14th a fugitive from justice, later being located at some point in South Carolina. Learning of his whereabouts, the Covington authorities, upon recognized requisition, brought him back to Kentucky, taking him first to Ludlow and later to Covington, where he was placed in jail. On the trip from South Carolina appellant was accompanied by several police officers. After lodgment in the Covington jail, it was suggested by one of the officers that Hall, another officer, go and talk to appellant.

Appellant was approached, and said he "would not talk now, but later." In the afternoon of the same day this officer with a turnkey went to appellant's cell, and at this time, or perhaps later, told appellant that Lattimore had made a confession. Appellant then agreed to go to police headquarters, where in the presence of four or five officers, and the stenographer who took his statement, he made the written confession. This statement was taken down in the presence of the officers, transcribed by the stenographer; later read to appellant, who signed same, after suggesting two or three immaterial corrections.

The document consisted of 200 or more questions propounded to and answered by appellant. Those officers who testified as to the statement, particularly with reference to its procurement, all agree in saying there was neither promise of reward or immunity made; no beating, threats, or coercion of any kind were indulged in. It may be noted at this point that all witnesses testifying on this phase of the case were put to and underwent a most searching and critical cross-examination.

This inquiry was begun before the jury, but when it became apparent that objections would be interposed at the proper time, the court recessed the jury and heard the testimony in their absence. After its introduction the jury reassembled and the testimony continued, appellant not being tendered as a witness, though he had testified in the absence of the jury.

We have reviewed this testimony with extraordinary care, and cannot escape the conclusion that the method or manner of its procurement in no wise transcends the provisions of the statute supra, or was such as to bring it into condemnation, under any of our decisions, including the one upon which appellant's counsel confidently rely. It seems to us that the inquiry was conducted in an orderly and legal manner. Appellant when brought forward to testify, touching the preliminaries leading up to his confession, did not claim that it was procured through force, violence, or under promise. His testimony was to the effect that on the trip from South Carolina to Covington (or Ludlow) he was asked no questions, and was well treated. He does say that he was alarmed, particularly so when the train arrived at the station in Kentucky. He feared mob vio-

lence, and asked the officers to protect him., He seemed relieved upon their assurance that they would do so. He states that when the train arrived there was a great crowd, but he does not claim that there was any evidence of violence. It appears that most of the crowd was made up of police officers, present for protective purposes; others merely out of curiosity. He was still nervous and frightened when brought to the police station, being afraid as he says, of the police officers, particularly the one who afterwards questioned him. His testimony is to the effect that when the officer began to question him they did nothing more than seat him at a table and "crowded" around him. They told him that Lattimore had made a confession, and this was true, since he says it was presented to him to read; that he read it in part, the remainder being read to him, and he recognized Lattimore's signature thereto.

Appellant said that some one told him at the beginning, "Lattimore had made a written statement and if I would make a written statement it would be better." After this hearing the court concluded that the better practice would be to submit to the jury the question as to whether or not the confession was procured by any unfair means, and we note from the record that this thought was carried out by the giving of an appropriate instruction on this subject. Appellant was not offered as a witness, nor did he testify later on this subject. In fact, as appears from the record, he also failed to testify or offer any witness on his behalf, bearing on the question of his innocence.

The strenuous objection of counsel for appellant came when his statement was proffered for the jury's consideration. We need not make reference to the confession, further than to say that except in some minor details and immaterial facts, it corroborated the testimony of the prosecutrix and her companion. The appellant admitted the accomplishment of his design as had been testified to by prosecutrix, with some incriminating additions. We say this because appellant testified that he and Lattimore, failing to fulfill an engagement with some colored girls, had agreed to and planned to attack "some white woman." Appellant in his statement said: "Just what we did do, that was our plan."

Counsel in brief say, and we agree, that it was

not necessary, under the facts as adduced, to introduce the statement of appellant, and that its introduction prejudiced appellant's substantial rights, because it was procured in violation of the statute, supra; the confession being obtained while appellant was incarcerated, during which time he was plied frequently, if not constantly with questions. They complain of the 200 or more questions and answers manifested by appellant's exhibited statement. The document does show more than the stated number of questions, but upon examination we find less than one-fourth of them related to the crime committed, all others merely bearing on inconsequential matters as to appellant's movements prior to and after the 17th of August, and matters relating to his companion Lattimore.

Counsel point to Cobb v. Com., 267 Ky. 176, 101 S. W. (2d) 418, 419, as being in support of the contention that the confession was illegally obtained. We do not agree that the opinion is conclusive, and distinctions noted do not permit us to be persuaded. It appears in the Cobb opinion that a statement or confession (not written) was admitted on trial over his objection. Cobb was arrested in Richmond and taken later to Covington by the arresting officers. These officers, as Cobb said, continuously plied him with questions; one of them told him he had helped another man after he had made a confession, so that he did not have to go to the penitentiary, and that if Cobb "would tell the truth it would be easier and anything he could do for him he would be glad to help." This continuous questioning was done during the trip until the party got within 50 miles of Covington, when, under the influence of the officers, Cobb finally made a confession, which we held was obtained in a way condemned by the statute.

Such was not the case here. There was an absence of any plying of questions on the trip from South Carolina to Kentucky, and none after appellant's arrival in Covington until after he had signified that he would make a statement. Nor can the suggestion of the best course to be pursued by appellant be construed as a promise of award, immunity, or assistance.

The foregoing being the main objection, we have given the complaint the most careful observation, and after doing so have concluded that the court did not err in permitting the confession to go to the jury. Par-

ticularly is this true, since there was, without it, ample proof upon which the jury could, and no doubt did, base its verdict of guilt. As bearing on our conclusion of no error in this respect, we may make reference to Eaton v. Com., 235 Ky. 466, 31 S. W. (2d) 718; Barton v. Com., 238 Ky. 356, 38 S. W. (2d) 218; Caruth v. Com., 251 Ky. 143, 64 S. W. (2d) 495; Bennett v. Com., 242 Ky. 244, 46 S. W. (2d) 84, and Montjoy v. Com., 262 Ky. 426, 90 S. W. (2d) 362.

The judgment, after directing the punishment assessed by the jury, fixing the day and date, and a particular place for the execution, limited the number and class of persons permitted to be present. It is complained that the judgment is not in due form or in accord with the statutes. Subsection 2 of section 1127, Kentucky Statutes, provides that "a common law offense, for which punishment is prescribed by statute, shall be punished only in the mode so prescribed." Section 1154, Kentucky Statutes, provides that the common-law offense here charged shall be punished by confinement in the penitentiary for a prescribed period, or by death. Sections 1137-1 et seq., Kentucky Statutes, and 294 of the Criminal Code of Practice, provide the mode of execution in death penalty cases. Section 1137-1, Kentucky Statutes, provides that all executions, where capital punishment is inflicted, shall take place within the walls of a penitentiary, the mode being by electrocution, and section 1137-4 provides what officers, and the number of persons of various classes, who may be present, excluding all others. The section supra (1) makes an exception where capital punishment is inflicted for the crime of rape or attempted rape. In such cases the sentence shall be executed by hanging, and in the county in which the crime is committed, by the sheriff of the county.

There is no claim that the court's order omits any detail which is required by either code or statute, to constitute a valid judgment. There is nothing in the law with respect of the naming of a particular place in the county for the execution, or in limiting the persons or classes of persons who may be present at the time of execution. If the mode, manner, or place of execution had been fixed otherwise than as prescribed by law, a different question might be presented. We find nothing contained in, or omitted from, the judgment as written, which tends in the least to deny to appellant any right

guaranteed him under the Constitution or laws. Section 353 of the Criminal Code of Practice provides that this court shall reverse a judgment "for any errors of law appearing on the record when, upon consideration of the whole case, the court is satisfied that the substantial rights of the defendant have been prejudiced thereby." If it could be conceived that by the entry of the judgment in form appellant was deprived of any substantial right vouchsafed him under the law, we would not hesitate to reverse the judgment; but we have no such impression.

Due to the fact that the penalty inflicted here is the severest known to the law, we have carefully read the proof, the entire proceedings, including the indictment and the instructions of the court, and have reached the conclusion that appellant has had a fair and impartial hearing. We therefore cannot disturb the judgment below.

Judgment affirmed.

The whole court sitting.